Filed 10/31/13  P. v. Essien CA1/5

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **THE PEOPLE,** | |
| **Plaintiff and Respondent,** | **A134046** |
| **v.** | |
| **EKANEM KUFREOBON ESSIEN et al.,** | **(Alameda County Super. Ct. No. H-50571)** |
| **Defendants and Appellants.** | |

A young woman was raped, robbed, and assaulted following a gathering at the home of an acquaintance.  The three men involved, defendants Ekanem Kufreobon Essien, Jacob Christian Mullan, and Braian Calvo were members of "Fremont Mexican Territory" (FMT), a gang aligned with the Norteños.  Following a joint trial before a jury, defendants were convicted of various felony offenses and gang enhancement allegations were found true under Penal Code section 186.22, subdivision (b)(1).[1]

In this appeal, all three defendants argue a joint trial was inappropriate because there was no single offense as to which all of them were charged.  They also challenge the sufficiency of the evidence to support the true findings on the gang enhancement allegations and aspects of the testimony by the prosecution's gang expert.  Essien contends his convictions must be reversed because the court refused to grant a timely

---

[1]  Further statutory references are to the Penal Code unless otherwise indicated.

motion to represent himself under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*), and additionally argues the sentence on one count should have been stayed under section 654. Mullan claims the court should have granted his motion for substitute counsel under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) made at the time of his sentencing hearing. We affirm.

PROCEDURAL HISTORY

The district attorney filed an information charging Essien and Mullan with rape in concert under section 264.1, subdivision (a) (count 1), with an allegation the crime was committed for the benefit of a criminal street gang under section 186.22, subdivision (b)(1). Essien and Calvo were charged with second degree robbery under section 211 (count 2), also with a gang enhancement allegation under section 186.22, subdivision (b)(1), and it was further alleged Calvo had personally inflicted great bodily injury in the course of that offense under former section 12022.7, subdivision (a). Calvo alone was charged with assault by means of force likely to produce great bodily injury under section 245, subdivision (a)(1) (count 3), with a gang enhancement allegation and great bodily injury enhancement allegation. Recidivist allegations as to Essien and Mullan were included.

After the trial court denied defendants' motions for separate trials, they were jointly tried before a jury. All three defendants were convicted as charged and the enhancements alleged as to each of them were found true. Essien was sentenced to an aggregate term of 34 years four months in prison, Mullan was sentenced to an aggregate term of 16 years in prison, and Calvo was sentenced to an aggregate term of 15 years in prison. All three appeal the judgment.

FACTS

Jane Doe lives in the Irvington section of Fremont. On January 28-29, 2011, she spent the evening with a neighbor and his friends and had a few drinks. While walking home from her neighbor's house around 1:30 a.m., Doe received a call from her friend Kevin Montoya, who invited her to a party at the home of Eric Kuehn. Doe had been to

Kuehn's house before and agreed.  Montoya and another man picked her up and gave her a ride.

Essien, Mullan, and Calvo were among the people at the party.  Everyone was drinking from a bottle of liquor and Doe took a couple of sips.  Calvo, who was 18 years old, began flirting aggressively with Doe.  She rebuffed him because she thought he was too young and she was not attracted to him, saying something to the effect of, "You're still riding training wheels so leave me alone."  At one point Calvo approached her and licked the side of her face, but she pushed him away and wiped her face with her shirt sleeve.  This made Calvo visibly angry and he kept his distance from her for the rest of the party.

The party started breaking up in the early morning hours, when it was still dark.  Doe was going to walk home, but Kuehn convinced her to stay, telling her it would be safer for her to leave when the sun came up.  Kuehn invited Doe to go into his bedroom and watch television, and she agreed.  Doe had been in Kuehn's bedroom before without incident.

Essien, Mullan, and Calvo joined Kuehn and Doe in the bedroom, which had both a bed and a futon, and Doe sat on the bed next to Kuehn.  Suddenly, Essien walked over and pushed Doe onto the bed.  At first she thought he was playing, but Essien continued to hold her down as she told him to stop.

Mullan pulled Doe's jeans and underwear down around her ankles.  Essien began having sex with Doe while she resisted.  Kuehn lay on the bed next to her, but did nothing; Mullan was behind Essien and held Doe's legs.  After Essien raped Doe for a few minutes, Mullan stepped up to the foot of the bed and began having sex with Doe as she screamed and thrashed on the bed.  Calvo, who was sitting on the futon, said, "That's what you get, bitch."  Kuehn told Mullan to stop because his parents would wake up, and Mullan stopped about a minute later.  Doe got up, pulled up her pants, grabbed her purse and left the room.  Kuehn opened the front door of the house for her and she walked outside.

Doe took her cell phone out of her purse to call her parents and was about to dial the number when the three defendants came up behind her. Essien punched her right eye, took her purse (which contained her cash and driver's license) and ran up the street. Calvo punched Doe in the left eye, took her phone and ran away. Doe looked at Mullan and said, "What the hell," and he ran off. Doe chased Calvo because she wanted her phone, and he punched her again in the left eye. She continued to chase him but gave up after he punched her in the left leg, causing her to fall.

A married couple on their way to shop at early morning garage sales drove by Doe as she was walking along, crying and bleeding. They stopped and offered her a ride, and she told them where she lived. On the way there, the husband asked whether Doe had been raped and she said she had been. The husband, who was driving, stopped the car in a parking lot and the wife called 911.

The officers who responded to the call followed Doe to the hospital where she was treated for facial injuries that included lacerations above and below her left eye and fractures of her maxillary sinus and left orbital bone. Doe admitted she had been sexually assaulted but lied about her attackers' identity because she was afraid. A sexual assault response team nurse examined Doe and collected samples. Doe was upset and sobbing and her clothes were ripped and blood stained. In addition to the injuries to her eye area, she had bruises on both upper thighs, tenderness and abrasions to the left knee, abrasions on her left ankle, tenderness in her right elbow, and swelling and tenderness on her left cheek. There were no signs of genital trauma, and tests for semen and saliva were negative. Scrapings taken from under Doe's fingernails did not match the DNA profiles of any of the defendants.

Doe did not initially cooperate with the police and did not tell them she had been at Kuehn's house. She was afraid of being labeled a "snitch" and was fearful someone would come after her. Fremont Police Detective Cortes reviewed Doe's file and contacted her a few days after the attack. She told him she had changed her mind and would cooperate, indicating she was afraid of retaliation because her assailants were in a gang. She identified a photograph of Kuehn and described one of her assailants as having

4

a gap between his front teeth. When she was shown a photographic lineup that included a picture of Essien (who had a gap between his front teeth), she said she was 90 percent certain he was one of the men, but she would need to see his teeth to be completely sure. She identified Essien in court when she saw him at the preliminary hearing.

Doe was shown another photographic lineup and wrote "maybe" next to Mullan's picture along with the word "Silent," which Cortez believed to be a nickname or moniker. She later told Cortes she had not been forthright in her tentative identification of Mullan because she knew he was involved in a gang and she feared retribution, especially because her driver's license with her current address had been stolen. Doe explained she had gone to Mullan's Facebook page and found disturbing photographs of people "you don't mess with." Cortes compiled another lineup with Mullan's picture, which Doe identified.

Doe also identified Calvo from a separate photographic lineup. Calvo was interviewed by Cortes and initially denied knowing Kuehn, though he later admitted he did know him. He claimed to have been with someone named "Jose" during the time Doe was attacked.

Doe identified all three defendants at trial.

The prosecution called Fremont Police Detective Eric Tang as a gang expert. Tang testified FMT is a criminal street gang operating in the Irvington district of Fremont, and is aligned with the Norteño street gangs. The Norteños, in turn, fell under the umbrella organization of Nuestra Familia, a prison gang. Nuestra Familia and its associated gangs, including FMT, are associated with the color red, the letter "N," and the number 14, "N" being the 14th letter in the alphabet.

Tang explained FMT is an ongoing organization with about 600 primary members and 100 associates, whose primarily activities include crimes such as robbery, murder and assault with a deadly weapon, and whose members have been convicted of felonies including assault by means of force likely to produce great bodily injury. FMT claims Fremont as its territory, and, with its increase in membership, has split into various subsets claiming certain districts within Fremont. One such subset is Irvington or "IRV."

5

In Tang's opinion, all three defendants were FMT gang members on the date of the crimes against Doe. Essien had a number of tattoos that together signified his gang membership in the Norteños and IRV; he had admitted being a Norteño; he had attended the 2009 memorial service of a murdered FMT member; and he had participated in a gangster rap video on YouTube promoting the Norteños. Mullan had tattoos signifying the Norteños and IRV; he had admitted being a Norteño during field contacts with police officers and when being classified in jail; he had been arrested in 2009 for possessing cocaine in the company of two FMT members (one of whom was Kuehn); and he was known by the moniker or nickname "Silent." Calvo had tattoos referring to the number 14; he was contacted while riding in a car with Essien while wearing gang colors; and he had admitted being a gang member when he was arrested in 2010 while trying to steal materials from a construction site, an incident in which he had thrown gang signs while challenging construction workers to a fight and had urinated in his jail cell after his arrest. In Tang's opinion, Kuehn was also a member of FMT, based on his tattoos, his prior contacts with the police, and gang memorabilia found in his bedroom, as was Doe's friend Montoya. Tang had reviewed Doe's statement to Cortes, in which she said she knew Irvington was Norteño territory and considered Kuehn's house to be a place where gang members congregated.

Tang explained that gangs thrive on power, which they gain by threatening and intimidating the community. People in the community do not want to cooperate with law enforcement due to fear. An individual gang member's status is raised by committing crimes, which shows the gang they can be trusted and intimidates the community.

In Tang's opinion, the sexual assault of Doe was committed for the benefit of a gang. Rape, though sexual in nature, is more about power than arousal, and the gang benefits by having four members who can verify the crime and "throw out into the community saying, look, we are still violent, we are still doing what we do so therefore the community should continually be afraid of us." The same was true of the robbery and assault, which appear to have been committed to silence Doe. Crimes committed by gang members are like "a notch in your belt," with the more violent crimes garnering more

6

status. Gangs benefit when their members commit crimes together, because it increases the chance of the crime being successful, it proves the loyalty of the gang members who participate, and it makes it more difficult for a gang member to exaggerate his role in an offense.

Regarding the sexual assault against Doe, Tang believed it was committed "in association" with gang members because Essien and Mullan worked together to commit the crime. In Tang's opinion, the robbery and assault committed by Calvo shortly after the rape was designed to show his dedication to the gang, particularly because he had not participated in the initial sexual assault. Tang also believed all the crimes were "done with the specific intent to promote, further or assist in gang conduct." All of the events happened in the Irvington district, which the victim knew to be Norteño territory, at a party where Norteño gang members were present, and the crimes involved Norteño gang members working together. "It promotes the gang, it promotes everything we talked about in terms of the power and fear it's going to have over the community."

Tang acknowledged during cross-examination that a rape involving a single suspect and a single victim would be "frowned upon" by Norteños, but, he explained, a rape involving several men "was actually somewhat accepted because it's almost seen as like a party or some sort of . . . exercise of power over somebody as opposed to . . . sexual gratification. And so I'm not going to say it's widely accepted, it's one of these codes that we see on the streets, it seems to be always talked about as none of these sex crimes are acceptable but, if they are, this is one that is accepted more than others."

Calvo called Professor James Hernandez as a defense expert in Northern California street gangs. Hernandez had reviewed materials pertaining to the case and concluded the sexual assault was not gang related, because rape was not a gang activity and was not well regarded among gang members. Hernandez noted none of the defendants were alleged to have exhibited gang colors, signs or names during the incident. He believed FMT was a loose association of individuals rather than a true gang, and that the Norteños were an "identity" rather than a real gang.

7

DISCUSSION

I. *Denial of Motion for Self-Representation (Essien)*

Essien argues the judgment against him must be reversed because the court denied his motion to represent himself under *Faretta*, violating his rights under the Sixth Amendment of the federal Constitution. We disagree.

After defendants were bound over at the preliminary hearing and the information had been filed, Essien filed a motion seeking new appointed counsel under *Marsden*. The court held an in camera hearing at which Essien described counsel's perceived shortcomings at some length and counsel responded. The trial court denied the *Marsden* motion, in response to which Essien stated, "Your Honor, I'd like to defend myself pro per." The following discussion ensued:

"THE COURT: No. You'll get an opportunity to do that. But you see, the thing is that the courts have found that a lot of times defendants essentially—when they don't get their way at the *Marsden* motion, they make that claim. So we don't just say, oh yeah, you can represent yourself.

"[ESSIEN]: I thought that was my constitutional right to represent myself.

"THE COURT: You do have a right to represent yourself, but you have to state it clearly, unequivocally, and you have to do it essentially without regard to who you might have for an attorney. You want to represent yourself because you want to represent yourself. But you are at the point where you know how to pick a jury, you know how to exercise challenges, you know how to do direct examination, you know how to do cross-examination, you know the laws of evidence and you will be able to effectively represent yourself. [¶] Now, if you have that opinion, then absolutely you will be able to represent yourself. But you don't do it on the spur of the moment; you don't do it because you're unhappy that you didn't get your way in this motion.

"[ESSIEN]: Then how do I do it?

"THE COURT: Well, when you get back there to Department 513 what you do is—with it just being denied, I doubt if they'll do your *Faretta* motion today. But they may put it on another date so that you can come in, fill out the form that you understand

8

that it's almost always a bad idea to represent yourself, that—essentially what you do is you give up any rights concerning incompetency of counsel when you represent yourself. So if you make a shambles of it, you make a shambles of it, and you've got nobody to blame but yourself.  [¶] Like I say, what happened was that *Marsden* motions have been going on for a long time.  A lot of guys sit there but they don't get their way, and they say 'I want to represent myself.'  [¶] And the courts are kind of taking the position that that's not really an unequivocal statement of the desire to represent yourself.  That's what's going to be required.  Like I say, they need to get that clear on the record that you're doing this because this is what you want to do, not because you're unhappy about something else.  [¶] And that needs to be done in open court.  Remember these are closed proceedings to protect the attorney-client privilege and such.  So you'll have to do that in open court.  But I've got a note on the file here that you may want a *Faretta*.  Okay?

"[ESSIEN]:  Um-hum."  Essien made no further requests to represent himself.

"A defendant in a criminal case possesses two constitutional rights with respect to representation that are mutually exclusive.  A defendant has the right to be represented by counsel at all critical stages of a criminal prosecution.  [Citations.]  At the same time, the United States Supreme Court has held that because the Sixth Amendment grants to the accused personally the right to present a defense, a defendant possesses the right to represent himself or herself." (*People v. Marshall* (1997) 15 Cal.4th 1, 20 (*Marshall*), citing *Faretta*, *supra*, 422 U.S. at p. 819.)  When a defendant knowingly and intelligently makes an unequivocal request to represent himself after being apprised of the dangers of doing so, the trial court must grant the request.  (*Faretta*, at p. 835; *People v. Valdez* (2004) 32 Cal.4th 73, 97-98 (*Valdez*).)

The right to represent oneself is triggered only by an *unequivocal* request. (*Valdez*, *supra*, 32 Cal.4th at pp. 98-99.)  "[I]n order to protect the fundamental constitutional right to counsel, one of the trial court's tasks when confronted with a motion for self-representation is to determine whether the defendant truly desires to represent himself or herself.  [Citations.]  The court faced with a motion for self-representation should evaluate not only whether the defendant has stated the motion

9

clearly, but also the defendant's conduct and other words.  Because the court should draw every reasonable inference against waiver of the right to counsel, the defendant's conduct or words reflecting ambivalence about self-representation may support the court's decision to deny the defendant's motion.  A motion for self-representation made in passing anger or frustration, an ambivalent motion, or one made for the purpose of delay or to frustrate the orderly administration of justice may be denied." (*Marshall*, *supra*, 15 Cal.4th at p. 23.)  We review the entire record de novo to determined whether a defendant's demand for self-representation was unequivocal.  (*People v. Danks* (2004) 32 Cal.4th 269, 295.)

Though Essien advised the court he wanted to defend himself and asserted he had a constitutional right to do so, he did so in direct response to the court's denial of his *Marsden* motion, in apparent frustration at the court's order.  Essien did not again raise the issue of self-representation, despite having been told by the court he could renew his *Faretta* request when the case was sent back to Department 513, where Essien was to be arraigned with his codefendants.  When a request for self-representation is made as an impulsive response to the denial of a motion for substitute counsel, and is not renewed at a later date, it is not unequivocal.  (*Valdez*, *supra*, 32 Cal.4th at pp. 97-99; *People v. Barnett* (1998) 17 Cal.4th 1044, 1087; *People v. Scott* (2001) 91 Cal.App.4th 1197, 1205; *Jackson v. Ylst* (9th Cir. 1990) 921 F.2d 882, 888.)

Essien suggests the court misled him into believing he would only be allowed to represent himself if he mastered certain legal skills, whereas a defendant's technical legal knowledge is not a prerequisite to self-representation.  (*Godinez v. Moran* (1993) 509 U.S. 389, 399.)  Although the court listed various legal procedures that would occur during a trial (jury selection, direct examination, cross-examination, the application of the rules of evidence) it also advised Essien he would be permitted to represent himself upon signing a form acknowledging that self-representation was usually a bad idea and giving up the right to claim ineffective assistance of counsel if he proceeded in pro per.  Considering all of the circumstances, Essien's request was equivocal and does not require reversal of the judgment.

## II. *Motion for Separate Trials (All Defendants)*

Defendants filed pretrial motions seeking separate trials, arguing they were not properly joined because there was no count common to all of them as required by section 1098. The trial court denied the motion, concluding (1) the gang enhancements amounted to common charges sufficient for joinder; and (2) the crimes were all part of a single transaction, making a joint trial appropriate. We reject defendants' argument that the court erred in denying severance and additionally conclude they have failed to demonstrate prejudice.

Section 1098 provides in relevant part, "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court orders separate trials." In *People v. Ortiz* (1978) 22 Cal.3d 38, 43 (*Ortiz*), the California Supreme Court interpreted this language to mean "a defendant may not be tried with others who are charged with different crimes than those of which he is accused unless he is included in at least one count of the accusatory pleading with all other defendants with whom he is tried." (Fn. omitted.) The defendant in *Ortiz* was jointly charged with three codefendants accused of a robbery distinct from the one in which he had participated. (*Id*. at pp. 45.) In concluding the joint trial was unauthorized, the court focused on the dangers of allowing a jury to hear evidence concerning a crime with which the defendant had no connection. (*Id*. at p. 47.)

In *People v. Hernandez* (1983) 143 Cal.App.3d 936, 941 (*Hernandez*), the court recognized an exception to the rule of *Ortiz* when the defendants are "charged with a crime or series of crimes committed as part of a single transaction," even if the defendants are not jointly charged with the same offenses. The three defendants in *Hernandez* were charged with different counts arising out of the gang rape of a single victim, leading one defendant to seek a separate trial under the authority of *Ortiz*. The court concluded a joint trial was appropriate, because section 1098 does not bar a single trial for defendants who "jointly committed a series of crimes against the same victim at the same time and in the same place." (*Hernandez*, at p. 939.)

11

"We are convinced that the Supreme Court [in *Ortiz*] did not intend, in establishing a rule requiring separate trials of defendants not jointly charged, to include within the purview of that rule defendants charged with crimes arising out of a single set of circumstances. The evil sought to be avoided by *Ortiz* was the prejudicial impact of irrelevant evidence. In a joint trial of unrelated offenses, the jury would hear evidence concerning the conduct of [the] defendant's associates, which evidence would not have been admissible in a separate trial. [Citation.] Here, of course, evidence concerning the conduct of all of the victim's assailants would have been admissible in either a joint or separate trial. Furthermore, a requirement of separate trials could subject the victim and all witnesses to the ordeal of two complete trials, with no attendant benefit to [one of the codefendants]. We therefore conclude that the *Ortiz* holding does not extend to defendants charged with a crime or series of crimes committed as part of a single transaction." (*Hernandez*, *supra*, 143 Cal.App.3d at pp. 940-941, fn. omitted.) The "single transaction" exception to the *Ortiz* rule was also applied in *People v. Wickliffe* (1986) 183 Cal.App.3d 37, 40-41 (*Wickliffe*), in which the court approved the joint trial of a defendant charged with driving under the influence and a codefendant charged with battery and assault where all of the crimes occurred during a joint operation of repossessing a vehicle.

In this case, Essien and Mullan were jointly charged with the rape in concert of Doe, and Essien and Calvo were jointly charged with the robbery of Doe. Essien cannot claim any violation of *Ortiz*, because he was "included in at least one count of the accusatory pleading with all other defendants with whom he [was] tried." (*Ortiz*, *supra*, 22 Cal.3d at p. 43.) As to Mullan and Calvo, they were not jointly charged with any offense, but their joint trial was appropriate because their crimes were part of a single course of violent conduct against the same victim and amounted to a "single transaction."

Defendants argue the published cases recognizing the "single transaction" exception to the *Ortiz* rule (*Hernandez* and *Wickliffe*) are distinguishable because they involved offenses by different defendants committed at precisely the same time and place, unlike the rape, robbery, and assault of Doe. We disagree. Though the robbery

12

and assault were committed outside the home where Doe was raped, the crimes were separated by only a short distance and a brief lapse of time. The robbery and assault were a continuation of the attack on Doe, and appeared calculated to intimidate her and prevent her from calling for help or reporting the rape. By any reasonable measure, the crimes were all part of a single transaction and a joint trial was appropriate. The court did not abuse its discretion in denying the motions for separate trial. (*Wickliffe, supra*, 183 Cal.App.3d at p. 42.)

Moreover, a joint trial held in violation of *Ortiz* requires reversal only if the defendant was prejudiced, i.e., if he demonstrates " 'a reasonable probability [he] would have obtained a more favorable result at a separate trial.' " (*Ortiz*, *supra*, 22 Cal.3d at p. 46; *Hernandez*, *supra*, 143 Cal.App.3d at p. 941.) When the jury would have heard the same evidence during a separate trial, prejudice from the presentation of such evidence cannot be inferred. (See *Hernandez*, at p. 941.) Here, the rape, robbery, and assault were all part of a single transaction resulting in a number of physical injuries to Doe, and it is inconceivable the evidence in any separate trial could have been presented in such a way that the jury would not have learned of the other offenses. This is particularly true in light of the gang allegation common to all counts, which required proof of defendants' relationship to the gang and association with each other.[2]

Essien argues, in a separate trial, the jury deciding the charges against him would not have learned of Calvo's brutal assault against Doe following the robbery because Essien himself was not charged with that assault. But an assault by a fellow gang member immediately following a robbery in which Essien participated would almost certainly have been admissible on the gang enhancement allegations against Essien.

Mullan suggests the joint trial was prejudicial to him because his "criminal liability ended at the bedroom door" and a jury hearing his case separately would not

---

[2]     The gang enhancements inform our analysis of the cross-admissibility of the evidence. In light of our conclusion the crimes fall within the "single transaction" exception to the *Ortiz* rule, we need not decide whether the trial court was correct in that the gang allegations in and of themselves made joint trials appropriate under section 1098.

have learned of Essien and Calvo's subsequent robbery and assault of Doe. This overlooks that the rape charge against Mullan included a gang enhancement allegation, and evidence of his fellow gang members' robbery and assault within minutes of the rape would have been admissible to prove that allegation, even if evidence of the robbery and assault would otherwise have been limited. In any event, evidence of the robbery and assault can hardly be said to be more inflammatory than the rape when it was clear Mullan did not participate in those subsequent offenses, and it is not reasonably probable Mullan would have obtained a more favorable verdict if evidence of the subsequent crimes committed by Essien and Calvo had been excluded or limited. (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1315-1316 (*Bradford*) [though cross-admissibility of evidence generally dispels the inference of prejudice necessitating a severance, its absence does not, by itself, establish prejudice].)

Mullan also complains the joint trial allowed the jury to hear testimony about Calvo's prior criminal conduct and Essien's participation in a "gangster rap" video glorifying the Norteños. Mullan argues this evidence was admitted for the sole purpose of proving Essien's and Calvo's membership in the FMT gang, and would not have been admissible against him in a separate trial. The evidence, however, was relevant to prove the gang enhancement, and was not particularly damaging to Mullan, as there was no suggestion he was involved in either of these prior incidents. (*Bradford*, *supra*, 15 Cal.4th at pp. 1315-1316.)

Calvo argues he was prejudiced by the joint trial, because evidence of the rape by Essien and Mullan would have been inadmissible if he had been separately tried. Particularly in light of the gang allegation, this assertion is untenable. Additionally, Calvo's advances toward Doe and his presence in the bedroom where she was raped supplied a motive for the robbery and assault and was admissible to show Doe had correctly identified him as the man who robbed and assaulted her.

In a supplemental letter brief, Calvo argues the joint trial and evidence of the rape by Essien and Mullan violated his due process right to a fair trial under the Fourteenth Amendment to the United States Constitution pursuant to *United States v. Lane* (1986)

14

474 U.S. 438. We are not persuaded. Calvo was charged with robbing and assaulting a woman who had just been raped by his fellow gang members while he stood present, and his crimes were alleged to be gang related. Assuming some of the details concerning the rape might have been excluded if Calvo had been separately tried, the fact of the rape itself could not have been completely excised from a separate trial. Essien and Mullan's conduct was highly relevant to prove the gang allegations on the counts with which Calvo was charged, as well as Calvo's motive in committing the robbery and assault, and the prejudice from that evidence cannot be said to be undue when it was clear Calvo, though present in the room, did not participate in the rape itself.

### III. *Gang Evidence and Enhancements (All Defendants)*

The jury returned true findings on the gang enhancement allegations under section 186.22, subdivision (b)(1). Defendants argue: (1) the evidence was insufficient to support the enhancements; (2) the prosecution's gang expert was allowed to offer improper opinions regarding the defendants' subjective intent and the ultimate issue of whether the offenses were committed for the benefit of or in association with a street gang; and (3) evidence of prior gang-related police contacts was unduly prejudicial. We reject the claims.

### A. Sufficiency of the Evidence

When assessing the sufficiency of the evidence to support a finding under section 186.22, subdivision (b)(1), "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs the evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).)

15

Section 186.22 authorizes a 10-year sentence enhancement (subd. (b)(1)(C)) for any violent felony "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members" (subd. (b)(1)). The statute contains two distinct prongs: the "benefit" prong and the "intent" prong. (*Albillar*, *supra*, 51 Cal.4th at p. 59.) Defendants challenge both.

The first prong is phrased in the disjunctive and may be satisfied in any of three ways: when the crime was committed "for the benefit of" the gang, when it was committed "at the direction of" the gang, *or* when it was committed "in association with" the gang. (§ 186.22, subd. (b)(1); *People v. Leon* (2008) 161 Cal.App.4th 149, 162.) A crime that meets any one of these criteria is " 'gang related' " for purposes of the statute. (*Albillar*, *supra*, 51 Cal.4th at p. 60.)

Here, the jury could reasonably determine the following: all three defendants were Norteño/FMT gang members; Essien and Mullan acted in concert when they raped Doe in the home of Kuehn, another FMT gang member; and the rape was committed in Calvo's presence and with his explicit approval, in apparent retaliation for Doe's earlier rejection of Calvo. Tang, given hypothetical questions based on these facts, concluded the rape was committed in association with the gang. In addition to Essien's and Mullan's cooperation in effectuating the sexual assault, the presence of four gang members in the bedroom was significant, as the perpetrators knew "no matter what you're going to have my back, no matter what I'm going to rely on you and we're not going to . . . snitch on each other." "[T]he jury could reasonably infer the requisite association from the very fact that [each] defendant committed the charged crimes in association with fellow gang members." (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 (*Morales*).)

The current case is similar to *Albillar*, in which the court upheld gang enhancements for three fellow gang members convicted of rape and sexual penetration in concert, based on their sexual assault of a young woman they knew. In rejecting an argument there was insufficient evidence to prove the crimes were committed in

16

association with the gang, the court in *Albillar* cited the prosecution's gang expert's testimony and explained, "Defendants not only actively assisted each other in committing these crimes, but their common gang membership ensured they could rely on each other's cooperation in committing these crimes and that they would benefit from committing them together. They relied on the gang's internal code to ensure that none of them would cooperate with the police. We therefore find substantial evidence that defendants came together *as gang members* to attack [the victim] and, thus, that they committed these crimes in association with the gang." (*Albillar*, *supra*, 51 Cal.4th at pp. 61-62.)

As to the remaining charges, the jury could conclude from Tang's testimony that the robbery and assault were designed to isolate and intimidate Doe and that Calvo in particular was acting to show his support of his fellow gang members. Substantial evidence supports the conclusion these crimes were committed in association with the gang, designed as they were to discourage a report of the gang-related rape.

Turning to the second prong of section 186.22, subdivision (b)(1), we consider whether the evidence was sufficient to prove the defendants acted "with the specific intent to promote, further or assist in any criminal conduct by *gang members*." (Italics added.) This provision is satisfied if the evidence demonstrates an intent to further any criminal conduct by a gang member—including the charged offense—and does not require a specific intent to assist the gang itself. (*Albillar*, *supra*, 51 Cal.4th at p. 67.) "[I]f substantial evidence establishes . . . the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer . . . the defendant" had the requisite specific intent. (*Id.* at p. 68; see also *People v. Ochoa* (2009) 179 Cal.App.4th 650, 661, fn. 6; *People v. Villalobos* (2006) 145 Cal.App.4th 310, 322; *Morales*, *supra*, 112 Cal.App.4th at p. 1198.) The evidence in this case readily supports the inference all three defendants acted with the intent to promote, further or assist their fellow gang members; i.e., each other.

Calvo argues Tang's opinion does not supply substantial evidence to support the verdict because Tang testified it was "based on the law which allows us to look as to why it would be a gang case," but never explained what he understood the law to be. Defense

counsel did not object on this basis, nor on the related ground Tang was offering an improper opinion as to the application of the law, thus forfeiting the claim. (Evid. Code, § 353.)

B. Gang Expert's Opinion on Defendants' "Subjective Intent"

Calvo argues he was prejudiced because Tang offered an improper opinion regarding his subjective intent when committing the robbery and assault. We disagree.

During direct examination, Tang opined the robberies in this case were done in association with gang members. When asked to explain this opinion, Tang responded, "Well, if I may be specific to Mr. Calvo[, who] did not actually participate in the sexual assault itself, in my opinion it shows he's trying to demonstrate to his fellow gang members, even though I didn't participate in the sexual assault itself I'm still going to get my hands dirty [by] punching her in the face and taking her cell phone." Defense counsel objected on the ground Tang was "articulating [Calvo's] subjective intent." The court overruled the objection, and the questioning proceeded as follows without further objection:

"[Prosecutor:] If a particular gang member does not participate in [a] crime, is that a negative?

"[Tang:] It can be looked at as a negative if there isn't some sort of support involved.

"[Prosecutor:] So they may never want to commit a further crime to show that they are loyal to the gang?

"[Tang:] Correct, Sir.

"[Prosecutor:] So how would that play out in this situation in your opinion, Sir?

"[Tang:] In this situation, whereas in any type of situation with a gang member who wasn't involved in the initial crime, it shows that they are . . . dedicated to the gang and they are [willing] to dirty their hands to show their fellow gang members even though I didn't participate in an initial crime with the rest of you, I am now dirtying my hands[,] I am going to help assist you in your crime. In this situation, I'm going to take her phone."

18

In *People v. Killebrew* (2002) 103 Cal.App.4th 644 (*Killebrew*), on which Calvo relies, the court reversed the defendant's conviction for conspiring to posses a handgun (§ 182; former § 12031, subd. (a)(2)(C), now § 25850, subd. (c)(3)) where the gang expert testified "when one gang member in a car possesses a gun, every other gang member in the car knows of the gun and will constructively possess the gun." (*Killebrew*, at pp. 647, 652.) The court explained while a gang expert's opinion may address the ultimate issue in the case, it is improper to opine a "specific individual had specific knowledge or . . . intent." (*Id*. at pp. 657-658.) The expert's testimony in *Killebrew* provided the only evidence to establish the element of the charged crime, and it did "nothing more than inform the jury how [the expert] believed the case should be decided." (*Id*. at p. 658; see also *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1194-1195 [finding the minor had carried concealed weapon for the benefit of a gang was reversed where only evidence was gang expert's testimony the minor would have used the knife to protect himself from and attack rival gang members].) In *People v. Vang* (2011) 52 Cal.4th 1038, 1046-1047 (*Vang*), the court disapproved *Killebrew* in part, and clarified a gang expert may offer an opinion regarding the defendant's intent so long as the expert was responding to a *hypothetical* question based on the facts of the case, even if the hypothetical was only " 'thinly disguised.' "

Tang's initial testimony regarding Calvo's motivation in committing the robbery was offered in a form that amounted to an opinion on what a particular defendant was thinking and, as such, it ran afoul of *Killebrew*. But the remainder of his testimony on the subject was a more generalized description of how gang members would view an associate who does not participate in a crime, and why a nonparticipant would want to show his loyalty by assisting in other ways. This testimony regarding the culture and habits of criminal street gangs was appropriate and admissible (*People v. Gardeley* (1996) 14 Cal.4th 605, 617) and did not in content vary materially from the objectionable portion of Tang's testimony. Tang's opinion about Calvo's desire to prove his loyalty to the gang would have been admissible if it had been couched in a hypothetical based on the circumstances of the case. (*Vang*, *supra*, 52 Cal.4th at p. 1046.) Any error in

19

allowing Tang to comment directly on Calvo's motivation was harmless as it is not reasonably probable Calvo would have obtained a more favorable result if that portion of Tang's testimony had been excluded. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Valdez* (1997) 58 Cal.App.4th 494, 511 (*Valdez*) [applying *Watson* standard to erroneously admitted gang evidence].)

Defendants additionally argue Tang should not have been permitted to offer an opinion the crimes were committed for the benefit of the gang and with the specific intent to promote, further or assist in gang conduct, because this amounted to no more than a subjective opinion about defendants' state of mind. As the People note, the claim has been forfeited for lack of a timely objection. (*People v. Roberts* (2010) 184 Cal.App.4th 1149, 1193; *Valdez, supra,* 58 Cal.App.4th at p. 505.) For similar reasons, we reject Calvo's challenge to the format of the prosecutor's hypothetical questions on this subject, which asked Tang to "assum[e] the facts in this case, as you know them to be."

C. Unduly Prejudicial Evidence of Gang History and Gang Contacts

Defendants argue Tang's testimony regarding the formation of the Nuestra Familia and the Norteños was more prejudicial than probative (Evid. Code, § 352). Recognizing the lack of a contemporaneous trial objection, they argue the issue was preserved by a motion in limine seeking to bifurcate evidence of the gang enhancements generally. We disagree. "A motion in limine can preserve an appellate claim, so long as the party objected to the specific evidence on the specific ground urged on appeal at a time when the court could determine the evidentiary question in the proper context. [Citations.]" (*People v. Solomon* (2010) 49 Cal.4th 792, 821.) The pretrial request to bifurcate the gang enhancements focused on Doe's prior inconsistent statements, which allegedly weakened the evidence of the substantive charges, and was insufficient to generally alert the court to the specific aspects of Tang's testimony now alleged to be unduly prejudicial.

Defendants also argue the court should not have allowed Tang to testify about various prior gang contacts to prove their membership in the gang: Essien's attendance of a gang member's funeral and his participation in a gangster rap video, Mullan's arrest for possession of cocaine in the presence of two other gang members, Calvo's attempted

20

theft of construction materials while flashing gang signs and challenging the onsite workers to a fight, followed by his urination in the jailhouse holding cell. Assuming this issue was adequately preserved by the litigation of the People's in limine motion concerning the admissibility of defendants' gang contacts, we conclude the court did not abuse its discretion in allowing the evidence. (See *People v. Avitia* (2005) 127 Cal.App.4th 185, 193.) It was highly probative on the disputed issue of whether defendants were members of the gang, and was not unduly prejudicial in light of the facts of this case. We note the trial court did exclude evidence of several other contacts the prosecution sought to introduce.

## IV. *Denial of Posttrial* Marsden *Motion (Mullan)*

On the day of his sentencing hearing, Mullan brought a motion for substitute appointed counsel under *Marsden*, *supra*, 2 Cal.3d 118. He contends the court erred in denying the motion and asks us to remand the case for further inquiry into the effectiveness of trial counsel. We reject the claim.

The court conducted an in camera hearing on the date of sentencing at which Mullan listed a number of reasons he believed he was not adequately represented at trial, including: (1) counsel never reviewed the police reports with him; (2) counsel repeatedly told him he would not be found guilty and would be exonerated by DNA evidence; (3) counsel told him he would not need to testify and never advised him of his right to testify; (4) counsel only met with him "one or two, three times for about 30 minutes each time to talk about this case"; (5) counsel never explained how much time he was facing if found guilty; (6) counsel never played the taped statement of Doe for him, which would have established his innocence; (7) counsel never discussed the gang allegation; (8) he (Mullan) never spoke to any investigator while preparing for trial; and (9) Kuehn was not called as a witness.

Asked by the court to respond, counsel indicated (1) he had gone over all of the charges with Mullan and advised him of his possible exposure, including the penalty for the gang enhancement; (2) he had never told Mullan he would be acquitted; (3) he had never advised Mullan he should not testify; (4) he had given Mullan all of the criminal

21

discovery in the case and had discussed the evidence in general, even if he did not go through the police reports with his client line-by-line; (5) he had advised Mullan the lack of DNA evidence linking him to the crime was very strong evidence in his favor, but he never said it would exonerate him; (6) he had seen Mullan several times more than Mullan claimed, both with and without an investigator; (7) Mullan had been given the transcripts of the statements made by the victim and counsel cross-examined her using her prior statements; and (8) he did subpoena Kuehn but did not call him as a witness because Kuehn would have been represented by the public defender and would be unlikely to testify. The court denied the *Marsden* motion as untimely and additionally found insufficient grounds for granting the motion, crediting counsel's versions of events over Mullan's.

A court faced with a *Marsden* motion for substitute counsel based on inadequate representation must hold a hearing and give the defendant the opportunity to explain the basis for his claims. (*Valdez, supra,* 32 Cal.4th at p. 95.) After the court has held a hearing on the matter, the decision to substitute counsel (or not) is one that rests in the sound discretion of the trial court, a defendant having no absolute right to more than one appointed attorney. (*Marsden*, *supra*, 2 Cal.3d at p. 123.) We review the trial court's ruling for abuse of discretion in light of the circumstances of the particular case, including (1) the timeliness of the motion; (2) the adequacy of the trial court's inquiry into the defendant's complaints; and (3) whether the conflict between the defendant and counsel is so great it resulted in a total lack of communication and prevented an adequate defense. (*People v. Cole* (2004) 33 Cal.4th 1158, 1190; *People v. Smith* (2003) 30 Cal.4th 581, 606-607.) A defendant bears a "very heavy burden" when bringing a *Marsden* motion. (*People v. Bills* (1995) 38 Cal.App.4th 953, 961.)

The court denied Mullan's *Marsden* motion based on its lack of timeliness and on its merits. Although Mullan correctly asserts a defendant can request substitute counsel at any time (*People v. Smith* (1993) 6 Cal.4th 684, 695), the court's ruling in this case was not based exclusively on the timing of the motion. Rather, the court listened to Mullan's complaints, elicited a response from counsel, and, crediting counsel, concluded

there was no basis for finding inadequate representation.  This was not an abuse of discretion.

## V.  *Section 654 (Essien)*

Essien's sentence of 34 years four months includes a consecutive term for the robbery count and the gang enhancement attached to that count.  He argues the court should have stayed this portion of the sentence under section 654, which precludes multiple punishment for a single act or indivisible course of conduct.  (*People v. Shaw* (2004) 122 Cal.App.4th 453, 458.)  We disagree.

Whether a course of conduct is indivisible for purposes of section 654 depends on the intent and objective of the actor.  (*People v. Hairston* (2009) 174 Cal.App.4th 231, 240.)  " 'It is [the] defendant's intent and objective, not the temporal proximity of his offenses, which determine whether the transaction is indivisible.  [Citations.]  . . .  [I]f all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, [the] defendant may be found to have harbored a single intent and therefore may be punished only once.  [Citation.]  [¶] If, on the other hand, [the] defendant harbored "multiple criminal objectives," which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, "even though the violations shared common acts or were parts of an otherwise indivisible course of conduct."  [Citation]'  [Citation.]" (*People v. Douglas* (1995) 39 Cal.App.4th 1385, 1393 (*Douglas*).)  "A trial court's implied finding that a defendant harbored a separate intent and objective for each offense will be upheld on appeal if it is supported by substantial evidence.  [Citation.]"  (*People v. Blake* (1998) 68 Cal.App.4th 509, 512.)

The trial court could quite reasonably conclude the rape and robbery involved multiple criminal objectives and were not merely incidental to each other.  Though the crimes were committed in close proximity to one another, the court may have believed the robbery was committed as an afterthought, to obtain Doe's identification and discourage her from reporting the sexual assault.  (*Douglas*, *supra*, 39 Cal.App.4th at p. 1393 [noting rule that "multiple punishment may be imposed where the defendant

23

commits one offense with one intent, then, as an afterthought, forms the independent intent to commit a second offense"].) Even if both the rape and the robbery were motivated by the desire to punish Doe for rejecting Calvo at the party, this did not negate other, separate intents and objectives: a desire to achieve sexual gratification during the rape, a desire to obtain valuable property during the robbery.

Essien suggests that because the prosecution argued the rape and robbery were part of a single transaction for purposes of determining whether the defendants could be jointly tried under section 1098, the crimes "logically" were part of a single transaction for purposes of section 654. We do not agree. Section 1098 and the case law interpreting it prohibits the joint trial of defendants who are not charged with a common offense or with offenses committed as part of the same transaction, the primary purpose of this rule being to guard against undue prejudice that would flow from the introduction of otherwise inadmissible evidence about crimes unrelated to those for which the defendant is charged. (*Hernandez*, *supra*, 143 Cal.App.3d at pp. 940-941.) Section 654 addresses a fundamentally different issue: whether multiple offenses committed by the same defendant during a course of conduct are indivisible, such that a single defendant should be punished only once. "[T]he purpose of section 654 is to ensure that a defendant's punishment is commensurate with his culpability." (*People v. Correa* (2012) 54 Cal.4th 331, 341.)

To say the crimes committed by Essien, Mullan, and Calvo were sufficiently intertwined to warrant a joint trial due to the commonality of the evidence to be presented does not answer whether Essien should be punished for both the rape and the robbery. A defendant who rapes and robs his victim is far more culpable than a defendant who commits only one of these offenses. In this case, in particular, the two crimes involved separate acts of violence and separate violations of the victim's bodily integrity. The consecutive sentence on the robbery count did not violate section 654.

## VI. *Cumulative Error*

Defendants argue the trial was fundamentally unfair due to the cumulative effect of the errors described above, even if those errors were not individually prejudicial.

24

Defendants have demonstrated only one error (Tang's testimony regarding Calvo's subjective motivation) and we have found that error harmless.  There are no other errors to cumulate.  (*People v. Linton* (2013) 56 Cal.4th 1146, 1217.)

DISPOSITION

The judgments are affirmed.


_____

NEEDHAM, J.


We concur.


_____

JONES, P.J.


_____

BRUINIERS, J.